# AGREEMENT BETWEEN

## AXA NETWORK, LLC, and its subsidiaries,
### hereinafter collectively called "AXA Network"
### and the undersigned, hereinafter called the ASSOCIATE

IT IS MUTUALLY AGREED, that

I. **Authority.** The Associate, when properly licensed, shall canvass on behalf of AXA Network for applications for insurance policies and annuity contracts to be issued by AXA Equitable Life Insurance Company (hereinafter "AXA Equitable"), or any insurance company affiliate thereof as may be provided by agreement between AXA Equitable and/or AXA Network and such insurance company affiliate, or any third-party insurer under contract with AXA Network or its affiliates at the time of such canvassing, and the Associate shall collect the first premiums and considerations thereon.

Notwithstanding the foregoing, the Associate shall canvass on behalf of AXA Network for such applications only in jurisdictions in which AXA Network is properly licensed to distribute such policies and contracts.

II. **Territory.** The Associate may canvass for applications for insurance policies and annuity contracts and otherwise operate within any jurisdiction and territory where both the Associate and AXA Network are properly licensed to sell such policies and contracts, but is assigned no exclusive rights in any territory.

III. **Commissions and Service Fees.** The Associate shall be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under this Agreement in accordance with the Schedules of Commissions (issued by AXA Network with notice to the Associate) in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid. If the Associate held an AXA Equitable agent's agreement immediately prior to entering into this Agreement, the Associate shall continue to be allowed commissions, service fees and additional compensation on premiums, and considerations for insurance policies and annuity contracts secured under such prior agent's agreement in accordance with the applicable Schedules of Commissions in force on the date of the application for the policy or contract, as such premiums and considerations become due and are paid. Upon termination of this Agreement, however, service fees and additional compensation, if any, shall no longer be allowed, and renewal commissions shall be allowed only as provided in the Vesting Provisions of Paragraph IV below.

IV. **Vesting of Commissions.** Renewal commissions on premiums for insurance policies and considerations for annuity contracts secured by the Associate under this Agreement, or under any prior agent's agreement between the Associate and AXA Equitable in effect immediately prior to this Agreement, to the extent allowable under the applicable Schedules of Commissions in force on the date of the application for the policy or contract, shall become vested as provided for in the applicable Schedules of Commissions.

If this Agreement shall terminate, a collection charge, as specified in the Schedules of Commissions, shall be deducted from payments of vested renewal commissions, except as otherwise provided in the applicable Schedules of Commissions.

V. **Assignments.** No assignment of this Agreement shall be valid. No assignment of commissions, service fees, or other compensation or payments due or to become due under this Agreement shall be recognized unless written acknowledgment of its receipt and filing is issued by or on behalf of AXA Network. No assignment of compensation or payments due or to become due shall be valid to the extent it violates any law, regulation, or AXA Network policy pertaining to the assignment or to the underlying transaction giving rise to the entitlement to the commission, service fee, or other compensation or payment.

VI. **Limitations on Associate's Authority.** The Associate shall have no authority with respect to AXA Network and/or AXA Equitable or any of their insurance company affiliates other than as expressly stated in this Agreement. Without limiting the generality of the foregoing, the Associate shall not:

- make, alter or discharge contracts,
- waive forfeitures,
- grant permits,
- name special rates or guarantee dividends,
- make any endorsements on policies and annuity contracts,
- accept or issue receipts for deferred or renewal premiums or considerations,
- receive any moneys due or to become due except as specified in Paragraph I of this Agreement or as specifically authorized in writing by an officer of AXA Network, provided, however, that any existing, written authorizations to receive any moneys due or to become due, specifically issued to the Associate by an officer of AXA Equitable under any prior agent's agreement between the Associate and AXA Equitable, shall remain in full force and effect,
- deliver a policy of life insurance or accident and health insurance unless payment of the premium shall have been made during the applicant's good health, or
- bind AXA Network and/or AXA Equitable or any of their insurance company affiliates in any way.

VII. **Regulations.** This Agreement is subject to such rules and regulations as AXA Network has established or may hereafter establish covering the conduct of its business.

**VIII. Rejections.** AXA Equitable and/or any of its insurance company affiliates shall at all times have the right in their sole discretion to reject any applications for their policies of insurance and annuity contracts.

**IX. Reservation of Rights.** The rights reserved to AXA Network and/or AXA Equitable in this Agreement or in any prior agent's agreement between the Associate and AXA Equitable, including without limitation those contained in Paragraphs X, XI, and XIV, and the obligations set forth in Paragraph XII of this Agreement, shall survive the termination of this Agreement.

**X. Collections and Return of Property.** All collections made by the Associate hereunder shall be kept in trust entirely separate and distinct from other funds, and shall forthwith be paid over in cash to AXA Network. Any and all property of AXA Network held by the Associate shall be returned to AXA Network at an appointed time, or on demand. All unpaid policies or contracts and all other property of AXA Equitable or any insurance company affiliate thereof held by the Associate shall be delivered to AXA Network at an appointed time, or on demand. Upon the earlier of the termination of this Agreement or request by AXA Network, any and all property, whether written or electronic, of AXA Network, AXA Equitable or any insurance company affiliate thereof held by the Associate shall immediately be returned to AXA Network. All such property shall be returned no later than the termination date of the Agreement, with or without demand.

**XI. Indebtedness.** AXA Network may offset as a first lien against any claim for compensation under this Agreement any debt due or to become due, hereunder or otherwise, from the Associate to AXA Network or any of its affiliates. Debt not fully satisfied by such offset is a personal debt of the Associate recoverable at any time with interest under AXA Network's rules. "Debt" as used herein includes, but is not limited to, paid but unearned commissions attributable to refunded termination values or to premiums wholly or partially unpaid or refunded, loans, and amounts claimed by AXA Network or any of its affiliates under any account with the Associate.

**XII. Privacy and Confidentiality.** The Associate shall abide by the privacy and confidentiality rules established by the Financial Industry Regulatory Association ("FINRA") and by AXA Network. The contractual rights and obligations in this Agreement are in addition to and do not displace applicable federal and state law governing, among other things, the privacy and confidentiality of client information.

The Associate shall comply with AXA Network's privacy policy and take reasonable steps to protect personal information about customers of AXA Network and/or AXA Advisors, LLC ("AXA Advisors"), including names, address, telephone numbers, etc., from being lost or stolen. The Associate shall not use personal information about customers of AXA Network or AXA Advisors for any purpose other than to provide products and/or services to them through AXA Network and/or AXA Advisors. The Associate shall not share personal information about customers of AXA Network or AXA Advisors with third parties without the express written consent of the customer or a senior officer of AXA Network.

**XIII. Termination.**

A. This Agreement shall be terminable forthwith if the Associate shall enter under contract with or into the service of any insurance company other than AXA Equitable or any insurance company affiliate thereof, or if the Associate shall fail to comply with any of the provisions or conditions of this Agreement, or if the Associate shall violate any law in force in the territory in which the Associate is doing business.

B. If this Agreement is terminated as a result of or following any of the circumstances described in Sub-Paragraph A of this Paragraph XIII, or if after termination of this Agreement the Associate engages in acts or practices proscribed by Paragraph X, Paragraph XII, or Sub-paragraph A or B of Paragraph XIV, the Associate shall forfeit all commission interest which might otherwise have been acquired under any agreement with AXA Network or under any prior agreement between the Associate and AXA Equitable.

C. Except as otherwise required by applicable law, this Agreement shall be terminable by AXA Network upon 30 days' prior written notice to the Associate where the Associate has failed to achieve applicable production standards.

D. Unless otherwise terminated, this Agreement may be terminated by either party with or without cause, by a notice in writing delivered personally, or mailed to the other party at the last known address, at least thirty days before the date therein fixed for such termination.

**XIV. Unauthorized Practices**

A. Non-Solicitation. As used in this Agreement, "Client" is defined as any entity or individual to which or to whom the Associate sold any product, account or service of AXA Equitable or any insurance company affiliate thereof, or for whom the Associate had servicing responsibilities, during the Associate's association with AXA Network. Unless otherwise agreed to in writing by AXA Network, the Associate agrees that for a two-year period following the termination of the Agreement, the Associate will not solicit by any means, either directly or indirectly, any Client, if such solicitation is for the purpose or has the effect of inviting, encouraging, causing, persuading, or requesting any Client to cancel, replace, reduce, surrender, fail to renew, or take any action that would result in a lapse of, a policy, product,

account, or service of AXA Equitable or any insurance company affiliate thereof.

As used in this Agreement, "Prospective Client" is defined as any entity or individual as to which or as to whom the Associate first obtained or learned information (including, but not limited to, the name of the entity or individual) during the Associate's association with AXA Network, and to which or to whom the Associate did not sell any product, account, or service of or similar to those offered by AXA Equitable or any insurance company affiliate thereof during the Associate's association with AXA Network. Unless otherwise agreed to in writing by AXA Network, the Associate agrees that for a two-year period following the termination of the Agreement, the Associate will not solicit by any means, either directly or indirectly, any Prospective Client, if such solicitation is for the purpose or has the effect of inviting, encouraging, causing, persuading, or requesting any Prospective Client to cancel, replace, reduce, surrender, fail to renew, or take any action that would result in a lapse of, a policy, product, account, or service of AXA Equitable or any insurance company affiliate thereof; to purchase a new insurance policy or annuity contract from the Associate or the Associate's new employer or any other business or entity; or to discontinue its contracts or business relationship with AXA Equitable or any insurance company affiliate thereof.

B. **Proselytizing.** Unless otherwise agreed to in writing by AXA Network, the Associate agrees that during the term of this Agreement and for a two-year period following the termination of this Agreement, the Associate will not directly or indirectly invite, encourage, cause, persuade, or request any employee, associate or other representative of AXA Network, AXA Equitable, or any insurance company affiliate thereof either to terminate his/her relationship with AXA Network, AXA Equitable, and/or their insurance company affiliates for any reason or to sell, to solicit, or to provide products, accounts or services on behalf of another company which are in any way similar to or competing with those sold, solicited and/or provided by AXA Network, AXA Equitable, or any insurance company affiliate thereof.

The prohibitions set forth in this Subparagraph B shall apply only to Associates, employees, and other representatives of AXA Network, AXA Equitable or any insurance company affiliate thereof who live or work in such state(s) as the Associate has been or becomes licensed to sell insurance for AXA Network, AXA Equitable, or any insurance company affiliate thereof.

C. **Rebates.** The Associate shall under no circumstances pay or allow, or offer to pay or allow, any rebate of premium or consideration in any manner whatsoever, directly or indirectly.

XV. **Injunctive Relief.** The Associate acknowledges that monetary damages for the breach of any of the Associate's obligations or undertakings contained in Paragraphs X, XI, and XIV of this Agreement will be inadequate and the Associate agrees that AXA Network will be entitled to preliminary and permanent injunctive relief, in addition to any other legal remedies that may be available to it, including attorney fees and costs, in the event of any breach by the Associate of any such obligation or undertaking contained in Paragraphs X, XI, and XIV of this Agreement.

XVI. **Arbitration.** The Associate agrees, as a condition of association with AXA Network, that any controversy or dispute arising under this Agreement or out of the Associate's association with AXA Network, AXA Equitable or any affiliate or subsidiary thereof, including, but not limited to, claims of discrimination and/or harassment under federal or state statute or otherwise, will be submitted to final and binding arbitration upon demand of either party. Notwithstanding the above provision contained in this Paragraph XVI, AXA Network shall be entitled to apply for and to obtain from any state or federal court, the injunctive relief provided for in Paragraph XV of this Agreement before or after the commencement of any arbitration proceeding, with such injunctive relief to be afforded to AXA Network pending the outcome of the proceeding. Any arbitration pursuant to this Agreement shall be conducted in accordance with, and governed by the Code of Arbitration Procedures of the FINRA, if within the FINRA's jurisdiction, and if not, then by and in accordance with the rules and procedures of the American Arbitration Association. It is understood that this arbitration provision does not constitute a waiver of the right to seek relief in a judicial forum to the extent that such a waiver is determined to be void or unenforceable under applicable law. Judgment upon any award of arbitrators may be entered into any court, state or federal, having jurisdiction thereof.

XVII. **Adverse Activity.** The Associate shall not violate any law in force in any territory in which the Associate is doing business. Additionally, the Associate shall not engage or become involved in any activity or other conduct or association, whether or not lawful, which affects or tends to affect adversely the reputation of AXA Network and/or AXA Equitable, or their affiliates, or of any of their associates or employees generally or specifically in their community, or which casts odium on them or on the officers or directors of AXA Network and/or AXA Equitable, or their affiliates or which might otherwise be detrimental to the business of AXA Network and/or AXA Equitable or their affiliates.

XVIII. **Associate Benefit Program.** The Associate may participate in the Associate Benefit Program as now or hereafter provided by AXA Network to the extent for which such Associate is qualified. The Associate shall not be

Prichard000093

eligible for workers' compensation or unemployment compensation benefits.

**XIX. Independent Contractor.** Nothing contained herein shall be construed to create the relationship of employer and employee between AXA Network or AXA Equitable and the Associate. Any prior 12th Edition or 20th Edition agreement between the Associate and AXA Network, AXA Equitable or any affiliate or subsidiary thereof that referred in any way to any such relationship is hereby superseded by this Agreement.

The Associate shall be free to exercise independent judgment as to the persons from whom applications for policies and annuity contracts will be solicited and the time and place of solicitation. The Associate shall abide by the rules and regulations of AXA Network in accordance with Paragraph VII hereof but such rules and regulations shall not be construed so as to interfere with the freedom of action of the Associate as described in this Paragraph.

**XX. Violations.** Without prejudice to AXA Network's right of termination under Paragraph XIII hereof, AXA Network shall have the right, if the Associate shall violate any of the terms of this Agreement, to suspend and withhold payment of any commission or service fee otherwise payable hereunder or under any prior agreement between the Associate and AXA Equitable, until satisfied that such violation has ceased or been cured.

**XXI. AXA Network's Prior Right.** While this contract is in effect, the Associate shall not, and shall not agree to, solicit, obtain or submit any application to any company other than AXA Equitable or any insurance company affiliate thereof, for any insurance policy or annuity contract, nor shall the Associate in any other way assist in obtaining or providing any such insurance or annuity from any such other company, unless specifically authorized in writing by AXA Network, provided, however, that any existing, written authorizations issued by an officer of AXA Equitable shall remain in full force and effect.

**XXII. Sole Agreement.** This Agreement is intended to be the entire and final understanding of the parties hereto, with respect to the Associate's authority as specified in Paragraph I of this Agreement, and shall supersede all prior agreements, if any, of the parties hereto with respect to such Associate's authority only. In addition, as of the date on which AXA Network becomes properly licensed in a particular jurisdiction to distribute insurance policies and annuity contracts of AXA Equitable or any of its insurance company affiliates, this Agreement shall supersede any agent's agreement between the Associate and AXA Equitable, to the extent then in effect, for the sale of such policies and contracts in that particular jurisdiction. This Agreement may not be modified other than by a writing approved by an officer of AXA Network. It is understood, however, that all existing obligations to AXA Network and/or AXA Equitable heretofore incurred or assumed by the Associate, and existing liens created in connection therewith, shall continue to exist, and the Associate's rights under any prior contracts and agreements, with AXA Network and/or AXA Equitable are not impaired, provided, however, that any rights under any prior agent's agreement between the Associate and AXA Equitable and/or AXA Network shall not be in addition to any rights accorded the Associate under this Agreement.

**XXIII. Effective Date.** This Agreement shall take effect in any jurisdiction where the Associate is properly licensed to sell insurance policies and annuity contracts of AXA Equitable or any of its insurance company affiliates, as of the date this Agreement is duly signed by the Associate and countersigned by an authorized representative of AXA Network.

IN WITNESS WHEREOF, the parties to this Agreement have subscribed their names this _12th_ day of _January_ _2012_.

EXECUTED IN DUPLICATE

X _____
ASSOCIATE NAME (ASSOCIATE CODE#)
David Prichard

_10462 Franklin st._
STREET ADDRESS

_Northglenn, CO     80233_
CITY (COUNTY) STATE

By: _____
BRANCH MANAGER

AXA NETWORK, LLC
for itself and its subsidiaries

By: Andrew J. McMahon